# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **JAMES A. WILLS, #157642,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | NO. 3:23-cv-00014 |
| ) | |
| **TIMOTHY EATON, et al.,** ) | JUDGE CAMPBELL |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER

James Wills, a state inmate in custody at the Morgan County Correctional Complex in Wartburg, Tennessee, has filed a pro se civil rights complaint under 42 U.S.C. § 1983 (Doc. No. 1, "the Complaint"),[1] an application for leave to proceed in forma pauperis (IFP) (Doc. No. 3), and a motion to appoint counsel. (Doc. No. 4.)

The case is before the Court for ruling on Plaintiff's IFP application and motion for counsel, and for an initial review under the Prison Litigation Reform Act (PLRA), 28 U.S.C. §§ 1915(e)(2) and 1915A, and 42 U.S.C. § 1997e.

## I. APPLICATION TO PROCEED IFP

A prisoner bringing a civil action may be permitted to file suit without prepaying the filing fee. 28 U.S.C. § 1915(a). Because it appears from Plaintiff's submission that he lacks sufficient financial resources to pay the full filing fee in advance, his application to proceed IFP in this matter

---

[1] Although the Complaint is verified, Plaintiff has also filed a separate affidavit wherein he testifies to the facts underlying his cause of action. (Doc. No. 2.) For purposes of initial review, the Court considers these two filings together.

(Doc. No. 3) is **GRANTED** and a $350 filing fee[2] is **ASSESSED**.

The warden of the facility in which Plaintiff is currently housed, as custodian of his trust account, is **DIRECTED** to submit to the Clerk of Court, as an initial payment, the greater of: (a) 20% of the average monthly deposits to Plaintiff's credit at the jail; or (b) 20% of the average monthly balance to Plaintiff's credit for the six-month period immediately preceding the filing of the Complaint. 28 U.S.C. § 1915(b)(1). Thereafter, the custodian shall submit 20% of Plaintiff's preceding monthly income (or income credited to Plaintiff for the preceding month), but only when the balance in his account exceeds $10. *Id.* § 1915(b)(2). Payments shall continue until the $350 filing fee has been paid in full to the Clerk of Court. *Id.* § 1915(b)(3).

The Clerk of Court **MUST** send a copy of this Order to the warden of the facility in which Plaintiff is currently housed to ensure compliance with that portion of 28 U.S.C. § 1915 pertaining to the payment of the filing fee. If Plaintiff is transferred from his present place of confinement, the custodian must ensure that a copy of this Order follows Plaintiff to his new place of confinement, for continued compliance with the Order. All payments made pursuant to this Order must be submitted to the Clerk of Court for the United States District Court for the Middle District of Tennessee, 719 Church Street, Nashville, TN 37203.

## II. INITIAL REVIEW

### A. Legal Standard

The Court must dismiss the Complaint (or any portion thereof) if it is facially frivolous or malicious, if it fails to state a claim upon which relief may be granted, or if it seeks monetary relief

---

[2] While prisoners who are not granted pauper status must pay a total fee of $402—a civil filing fee of $350 plus a civil administrative fee of $52—prisoners who are granted pauper status are only liable for the $350 civil filing fee. *See* 28 U.S.C. § 1914(a)–(b) and attached District Court Miscellaneous Fee Schedule, provision 14 (eff. Dec. 1, 2020).

against a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A(b). The review for whether the Complaint states a claim asks whether it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," such that it would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although pro se pleadings must be liberally construed, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), they must still "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, upon "view[ing] the complaint in the light most favorable to the plaintiff[.]" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009). In applying this standard, the Court only assumes that the *facts* alleged in the Complaint are true; allegations that consist of legal conclusions or "'naked assertion[s]' devoid of 'further factual enhancement'" are not accepted as true. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Plaintiff filed this action under 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012).

**B. Analysis of the Complaint**

1. Facts

Plaintiff's verified Complaint and affidavit (Doc. Nos. 1 and 2) establish the following facts for purposes of initial review:

On January 11, 2022, Dickson County Sheriff's Deputies Christopher Lewis and Jason Thompson arrived at a residence to execute a warrant for Plaintiff's arrest, but Plaintiff was not at

3

the residence. (Doc. No. 1 at 3.) Plaintiff's nephew advised the Deputies that Plaintiff "was driving a two door Ford Explorer heading to . . . a church on Highway 70 and CCC Road" to wait for a different nephew of his. (*Id.*) After arresting Plaintiff's nephew at the residence "for several firearm charges," Lewis and Thompson left the residence and proceeded toward the church to arrest Plaintiff, who had missed a court date. (*Id.*; Doc. No. 2 at 2.) But en route to the church, the Deputies encountered a two-door Ford Explorer which they determined (correctly) was being driven by Plaintiff. (Doc. No. 1 at 4.) Plaintiff thought the vehicles behind him (including a Ford F-150 truck driven by Lewis and Thompson, and two cars driven by other officers) looked suspicious, so he "sped through the stop sign" and headed down Dupree Road, a dead-end road. (Doc. No. 1 at 4; Doc. No. 2 at 2.) Only after speeding through the stop sign did Plaintiff realize that the vehicles behind him were unmarked police vehicles. (Doc. No. 2 at 2.) Because Plaintiff "didn't want to go to jail," he "continued driving hoping to lose the vehicles following [him]." (*Id.*) Plaintiff was a felon and had a gun in the vehicle, so "[i]f nothing else [he] wanted to get rid of the gun before [he] stopped." (*Id.*)

When he came to the end of Dupree Road, Plaintiff "drove through a barbwire fence and entered into a field" where the two cars could not follow due to the terrain. (Doc. No. 1 at 4.) But Lewis and Thompson were able to follow in their truck. Plaintiff nearly got stuck in the mud and "started doing doughnuts in the field," whereupon Lewis and Thompson exited their truck "at gun point" (meaning, presumably, with guns drawn) and gave verbal commands to stop. (*Id.*) But Plaintiff "continued slow movement with high engine RPM still attempting to flee." (*Id.*) Thompson continued the pursuit on foot for about 100 yards, while Lewis returned to the truck. (*Id.*) Lewis caught up to Thompson, picked him up, and the pursuit continued. (*Id.*) Plaintiff proceeded to drive his Ford Explorer through a metal cattle gate and across a large field, while

4

Lewis and Thompson pursued along a tree line the length of the field. (*Id.* at 4–5.) Plaintiff then continued into the woods, "down a muddy logging road." (*Id.* at 5.) Approximately 100 yards down that logging road, and "nearly two miles" from where he left Dupree Road, Plaintiff's "Ford Explorer came to rest and could not go any further," "getting stuck in the mud." (*Id.*; Doc. No. 2 at 2.)

Plaintiff then "grabbed the gun and was getting out of the vehicle to throw it," but as he emerged from the vehicle, Lewis and Thompson were right there, "two feet from the driver's door." (Doc. No. 2 at 2.) Plaintiff "still had the gun in [his] hand wanting to throw it" (*id.*) but was struck in the chest by both probes of Thompson's taser. (Doc. No. 1 at 5.) Plaintiff alleges that, according to Thompson, "Plaintiff forced his right hand out from his back and he was holding a black semiautomatic handgun which was pointed at [Thompson]," but Plaintiff states that he "did not point the gun at anyone." (*Id.*) He also states that Deputy Lewis allegedly "saw Plaintiff turn to Plaintiff's left and point the gun towards Defendant Thompson and himself," but Plaintiff repeats that he "never pointed the gun I had in my hand at either of them." (*Id.* at 6; Doc. No. 2 at 3.) He also alleges that "if I did, in fact, still have the gun in my hand that the electric voltage of Deputy Thom[pson]'[s] taser caused my impaired body to bring my right arm around." (Doc. No. 2 at 3.) In any event, after his taser proved ineffective, Thompson drew his own gun and attempted to squeeze the trigger but could not get it to fire, so he "yelled 'gun' three times and ordered the Plaintiff to drop the gun more than once." (Doc. No. 1 at 5.) While Thompson retreated to the rear passenger side of Plaintiff's vehicle to regain functionality of his gun, Lewis fired his weapon, and Thompson followed suit shortly thereafter. (*Id.* at 5–6; Doc. No. 2 at 3.) Plaintiff was struck by multiple bullets, "including being struck in the head." (Doc. No. 1 at 7.) He fell to the ground, and the violent encounter ended. Plaintiff was transported to the hospital for treatment. (*Id.*)

Plaintiff alleges that Lewis and Thompson knew he was armed and should have attempted crisis negotiation instead of using their weapons to subdue him. (Doc. No. 2 at 3.) He claims that these Defendants' use of deadly force "without need or provocation" was "excessive and unnecessary" in violation of his constitutional rights, while also constituting assault, battery, and negligence under state law. (Doc. No. 1 at 1–2, 8.) He further claims a failure to adequately train, discipline, and supervise Defendants Lewis and Thompson by multiple superior officers in the Dickson County Sheriff's Office. (*Id.* at 2–3, 8–9.) As relief, Plaintiff seeks a declaration that his rights were violated and an award of damages. (*Id.* at 9.)

2. Discussion

To support a viable claim under § 1983, the Complaint must allege "that a defendant acted under color of state law" and "that the defendant's conduct deprived the plaintiff of rights secured under federal law." *Handy-Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 539 (6th Cir. 2012) (citations omitted). Dickson County Sheriff's Deputies Lewis and Thompson (and their superior officers) are state actors for these purposes. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 & n.55 (1978) (holding that local governments and officers are proper defendants under § 1983). Thus, the viability of this action under § 1983 turns on whether a constitutional violation is adequately alleged.

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). To state a plausible claim that his Fourth Amendment right not to be unreasonably seized was violated by Defendants' use of deadly force in effecting his arrest, Plaintiff must allege facts which allow the inference that the Defendant officers' actions were "objectively unreasonable in light of the facts and circumstances confronting

6

them, without regard to their underlying intent or motivation." *Thornton v. City of Columbus*, 727 F. App'x 829, 836 (6th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see Hyde v. Bowman*, No. 4:19-CV-91, 2023 WL 119462, at *2–4 (S.D. Ga. Jan. 6, 2023) (dismissing Fourth Amendment use-of-deadly-force claim on initial review "based on the allegations in Hyde's Amended Complaint," which showed that "Bowman's use of deadly force was objectively reasonable in light of the facts confronting him") (emphasis and internal quotation marks omitted).

The Sixth Circuit has "authorized the use of deadly force only in rare instances in which the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 479 (6th Cir. 2022) (quoting *Jacobs*, 915 F.3d at 1040) (internal quotation marks omitted). "Ultimately, the question is whether the totality of the circumstances justified" the use of force, *Jacobs*, 915 F.3d at 1040, including such circumstances as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Campbell*, 47 F.4th at 479 (quoting *Graham*, 490 U.S. at 396). Plaintiff's federal claims of excessive force and failure of the various superior officers to train or supervise the arresting officers all hinge on whether the Complaint's allegations, presuming their truth and drawing reasonable inferences from them in Plaintiff's favor, plausibly support a finding that the use of deadly force against him was unjustified. They do not.

The Complaint's allegations establish that Plaintiff attempted to evade arrest by leading Defendants Lewis and Thompson on a dangerous, miles-long, off-road chase through a barbed wire fence, a metal cattle gate, an open field, and a logging road. He refused commands to stop along the way when his truck slowed after losing traction. When his flight ultimately ended in the mud of the logging road, he emerged from his truck holding a black semiautomatic handgun.

7

Although he alleges that he intended to throw the gun before encountering Thompson, the "subjective intent of the victim—unavailable to the officers who must make a split-second judgment—is irrelevant to the question [of] whether his actions gave rise to a reasonable perception of danger." *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 350 (6th Cir. 2007) (Boggs, C.J., concurring) (quoted in *Thornton*, 727 F. App'x at 837). Though Plaintiff had a gun in his right hand, Thompson had his taser drawn and used it in his initial attempt to subdue Plaintiff. But whatever effect the taser had, Plaintiff's allegations establish that he did not drop the gun when tased; indeed, still holding the gun, he brought his right arm around from behind his back. The Complaint indicates that Lewis and Thompson reported seeing Plaintiff point his gun in their direction, though Plaintiff insists that he "never pointed the gun I had in my hand at either of them." (Doc. No. 2 at 3; *see also* Doc. No. 1 at 5, 6 (alleging Plaintiff "did not point the gun at anyone").)

Regardless of whether or not Plaintiff raised the gun and pointed it at Defendants, the Complaint establishes that he confronted Defendants at quarters close enough to enable Thompson to use his taser and "observ[e] both probes strike Plaintiff" (Doc. No. 1 at 5), and that he refused to drop the gun despite Thompson's use of the taser and repeated verbal commands to do so. These circumstances confronting Thompson and Lewis, viewed "from the perspective of a reasonable officer on the scene," *Graham*, 490 U.S. at 396, render their subsequent use of deadly force objectively reasonable in light of the immediate threat Plaintiff posed to their safety. *Cf. Thornton*, 727 F. App'x at 837 ("And though Thornton never pointed the shotgun at the Officers before they fired their weapons, the undisputed manner in which Thornton was holding the weapon combined with the short distance between himself and the Officers further leads this court to conclude that any reasonable police officer would believe that Thornton posed a serious physical threat that required a use of deadly force."); *see also Campbell*, 47 F.4th at 480 (discussing circuit precedent

establishing that "the fact that an individual . . . possesses a weapon[] is not enough to justify the use of deadly force" unless "additional circumstances" are present "that would lead a reasonable officer to believe there was a threat to the safety of others," such as "engaging in a dangerous car chase and ignoring multiple commands"); *Jacobs*, 915 F.3d at 1040 (discussing "the threat factor" and noting that "merely possessing a weapon is not enough," "[b]ut on the other end of the spectrum, an officer need not face the business end of a gun to use deadly force"). No reasonable juror could find otherwise. Accordingly, Plaintiff's Fourth Amendment claims under § 1983 must be dismissed.

Because no federal claim remains, the Court in its discretion declines to exercise supplemental jurisdiction over Plaintiff's state law claims and dismisses those claims without prejudice. *See Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996).

### III. CONCLUSION

For the reasons given above, this action is **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a claim upon which relief can be granted. Plaintiff's state law claims are dismissed without prejudice to his right to pursue them in state court. Plaintiff's pending motion for appointment of counsel (Doc. No. 4) is **DENIED** as moot.

This is the final Order denying all relief in this matter. The Clerk **SHALL** enter judgment. Fed. R. Civ. P. 58(b). The Court **CERTIFIES** that any appeal from this Order would not be taken in good faith. 28 U.S.C. § 1915(a)(3).

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE